Ronald D. Coleman, Esq. (RC 3875)
Lawrence P. Eagel, Esq.
Raymond A. Bragar, Esq.
BRAGAR WEXLER & EAGEL, P.C.
One Gateway Center, Suite 2600
Newark, NJ 07102
(973) 471-4010
(973) 471-4646 (facsimile)

      -and-

Jeffrey H. Squire, Esq.
KIRBY MCINERNEY & SQUIRE, LLP
830 Third Avenue
New York, NY 10022
(212) 371-6600
(212) 751-2540 (facsimile)

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEW JERSEY

_____

|  |  |  |
|---|---|---|
| TRINAD CAPITAL MASTER FUND, LTD., individually and derivatively on behalf of MAJESCO ENTERTAINMENT COMPANY, | ) ) ) ) | Case No. |
| Plaintiff, -against- | ) ) ) ) | **Jury Trial Demanded** |
| MORRIS SUTTON, JESSE SUTTON, JOSEPH SUTTON, LOUIS LIPSCHITZ, AND LAURENCE ARONSON, | ) ) ) ) | |
| Defendants, | ) ) | |
| MAJESCO ENTERTAINMENT COMPANY, | ) ) | |
| Nominal Defendant. | ) ) | |

_____

## **COMPLAINT**

     Plaintiff Trinad Capital Master Fund, Ltd. ("Trinad") complaining of defendants alleges, on information and belief, as follows:

### Nature of Action

1.       Plaintiff brings this action on its own behalf and on behalf of Majesco Entertainment Company ("Majesco" or the "Company") against certain directors and officers of Majesco, to recover damages for, *inter alia*, their breaches of fiduciary duty and duty of loyalty to Majesco and its shareholders. As shown below, from late 2004 and continuing through the present, these directors and officers engaged in acts of self-dealing, violations of law, corporate waste and other acts of gross mismanagement, all of which caused damage to Majesco. The crux of defendants' wrongdoing has been a pattern of misconduct intended to perpetuate and entrench the Suttons' control of Majesco to the detriment of the Company and its shareholders.

### Jurisdiction and Venue

2.       This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 on the ground that the plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

3.       Venue is proper in this district pursuant to 28 U.S.C. §1391 on the ground that a substantial part of the events or omissions giving rise to the claim occurred in this District.

### The Parties

4.       Plaintiff Trinad is a Cayman Islands corporation with its principal place of business in the Grand Caymans, Cayman Islands. As of the date hereof, Trinad owns 2,909,076 shares of Majesco common stock, which represents approximately 12.33% of the outstanding shares of Majesco's common stock. During the relevant period described below, Trinad purchased shares of Majesco's common stock at a total cost of $10 million. Upon information and belief, Trinad has become Majesco's largest single shareholder.

5.      Majesco is a Delaware corporation with its principal executive office in Edison, New Jersey.  It holds itself out to the public as a provider of diversified products, including games, videos and gadgets for digital entertainment platforms.  Majesco was formerly known as Majesco Holdings Inc., and at all relevant times was a public company subject to SEC reporting requirements.  On April 8, 2005, Majesco Holdings, Inc. changed its name to Majesco Entertainment Company, and also changed its ticker symbol from "MJES" to "COOL."   At certain times, Majesco's common stock has traded on the NASDAQ-National Market System.  Plaintiff Trinad brings this derivative action individually and on behalf of Majesco, and lists Majesco as a nominal defendant herein.

6.      From December 2003 until August 23, 2006, defendant Morris Sutton was a director of the Company, an operating officer, and Chairman Emeritus of Majesco's Board of Directors.  From February 6, 2006 until August 23, 2006, he served as interim Chief Executive Officer of Majesco.  Although not listed as such in Majesco's public filings from December 2003 until August 23, 2006, Morris Sutton acted in the capacity of a senior executive officer of Majesco and as the person leading Majesco's sales efforts.  Upon information and belief, Morris Sutton is a citizen of the state of New Jersey.

7.      On August 23, 2006, Morris Sutton resigned from his post as interim Chief Executive Officer and from the Board of Directors.  At the same time, the Company disclosed that Morris Sutton would return to his position as Chairman Emeritus and lead the Company's sales force and distribution efforts.

8.      Since December 2003, defendant Jesse Sutton, a son of Morris Sutton, has been President of Majesco.  Jesse Sutton was also a director of Majesco from December 5, 2004

3

until February 6, 2006. On August 23, in connection with Morris Sutton's resignation, Jesse Sutton was appointed interim Chief Executive Officer, and was elected to replace Morris Sutton as a director. Upon information and belief, Jesse Sutton is a citizen of the state of New Jersey.

9.     Since December 2003, defendant Joseph Sutton, a son of Morris Sutton, has been Executive Vice-President of Research and Development. Joseph Sutton was also a director of Majesco from December 5, 2003 until February 6, 2006. Upon information and belief, Joseph Sutton is a citizen of the state of New Jersey. (Morris Sutton, Joseph Sutton and Jesse Sutton are collectively referred to herein as "the Suttons")

10.     At all relevant times, defendant Louis Lipschitz ("Lipschitz") has been a director of Majesco and a member of Majesco's nominating and corporate governance committee, audit committee and compensation committee. Upon information and belief, Lipschitz is a citizen of the state of New Jersey.

11.     At all relevant times, defendant Laurence Aronson ("Aronson") has been a director of Majesco and a member of Majesco's nominating and corporate governance committee, audit committee and compensation committee. Upon information and belief, Aronson is a citizen of the state of New Jersey.

## Statement of Facts

12.     Prior to December 2003, Majesco was a struggling private company owned and controlled by defendants Morris Sutton, Jesse Sutton and Joseph Sutton (the "Suttons"). In December 2003, Majesco entered into a reverse merger agreement with Connectivecorp, a public company, and in February 2004, the Company raised $21 million in a private offering of securities.

13.     For the fiscal year ended October 31, 2004, Majesco reported record sales

4

of $120.9 million and a record gross profit of $34.7 million. But for a non-cash charge of $18.5 million relating to a change in the fair value of the warrants issued in connection with the private placement, Majesco would have reported net income of approximately $3.2 million for fiscal year ended October 31, 2004. Following the release of its financial results, Majesco's management projected that sales in fiscal year 2005, ending October 31, 2005, would grow to $175 to $180 million.

14.     At the same time, in late 2004, Majesco was planning its first public offering of securities. Majesco planned to raise approximately $50 million in an equity offering of approximately $71 million, and by the exercise of warrants. The financial results for fiscal year ended October 31, 2004 were critical to the success of the offering.

15.     As more fully set forth below and in the Consolidated Class Action Complaint filed in the action pending in this court entitled *In re Majesco Entertainment Co.*, Dk. No. 05-03557 (the "Class Action"), however, instead of accurately reporting Majesco's financial performance, the Suttons recklessly – and in breach of their fiduciary duty to Majesco – caused Majesco to inflate its revenue and earnings by, *inter alia*, capitalizing certain software development costs to defer expenses, inflating revenue through channel stuffing activities, and decreasing Majesco's allowances for price concessions. The effect of these accounting manipulations was to inflate earnings, revenues and assets and decrease costs in order to portray Majesco as a healthy, growing company when in fact the opposite was true. By opinion dated September 29, 2006, the Court in the Class action denied defendants' motions to dismiss the complaint for failure to state a claim and failure to plead with particularity.

16.     At the time of the offering, the Suttons expressed unrealistic optimism to

the investing public by claiming that Majesco was projecting an increase in sales from an inflated $120 million reported in fiscal 2004, to $175-$180 million in fiscal 2005. The Suttons, in fact, had no basis for these projections. Instead, the Suttons made the projections in order to portray falsely Majesco as a growing company so that Majesco could complete the planned public offering.

17.     Majesco completed the offering in mid-January 2005, raising $50 million for the Company. By then, the Suttons knew that Majesco had no chance of meeting the projections of sales and revenues issued at the time of the offering. Consequently, the Suttons embarked on a reckless plan of spending millions of dollars to purchase software developed by others, and on products Majesco was developing without any realistic business plan or budget.

18.     By June, within six months after the offering, Majesco had spent – and lost – virtually all of the money it had raised in the offering.

19.     Throughout the planning stages of the January 2005 offering, the Suttons urged Majesco's underwriters to allow the Suttons to sell their own shares in the offering. The Suttons' shares were subject to a "lock-up" agreement, prohibiting them from trading the shares until October 2005. The underwriters objected to the Suttons' sale, and the Suttons ultimately did not participate in the offering. Shortly after the offering was complete and continuing for months thereafter, the Suttons made numerous unsuccessful attempts to release themselves from the lock-up agreement.

20.     By the end of fiscal 2005, Majesco announced that its total assets had decreased from $100 million after the offering, to $30 million, and that it had suffered losses exceeding $72 million for the fiscal year. By then, Majesco's CEO and half of its independent directors had resigned. In their audit for fiscal year ended October 31, 2005, Majesco's auditors

issued a disclaimer to their audit report stating that the Company's losses raised substantial doubt about the Company's ability to continue as a going concern.

21.  In less than nine months, the $50 million raised in January disappeared without benefit to Majesco. During fiscal 2005, Majesco spent millions on development costs, which it capitalized at first, and then wrote off. In addition, Majesco wrote off millions in previously recorded receivables.

22.  This pattern of misrepresentations by defendants led to the filing of the Class Action on behalf of those who purchased Majesco common stock between December 8, 2004 and September 12, 2005. Plaintiffs in the class action seek damages against the Suttons and the Company in excess of $100 million.

23.  During the Class Period, in reliance on the misrepresentations described in the Class Action, Trinad purchased over one million shares of common stock at a cost of approximately $10 million, and it suffered millions in losses as a result. In the action recently commenced by Trinad, entitled *Trinad Capital Master Fund, Ltd. v. Morris Sutton,* Dk. No. 06-04880 (the "Securities Action"), Trinad seeks to recover damages based upon the misrepresentations set forth therein during the Class Period.

24.  Notwithstanding the foregoing, after the Class Action was filed, instead of taking action to install responsible management in light of the huge losses and write-offs reported for the fiscal year ended October 31, 2005, the Suttons, Aronson and Lipschitz saw fit to reward each of the Suttons with lucrative employment and benefit packages.

25.  Moreover, Morris Sutton insisted that the Board elect and retain his sons as senior executive officers of Majesco. Neither Jesse Sutton nor Joseph Sutton were or are qualified

7

for the positions to which they were elected.

26.     Commencing in fiscal 2005, Majesco faced substantial economic reversals.  Nevertheless, Majesco paid Jesse Sutton more than $555,000 in total cash compensation and granted him options to purchase 90,000 shares of common stock with a value as of the grant date of $288,000.  Majesco paid Joseph Sutton more than $246,000 in total cash compensation and granted him options to purchase 51,000 shares of common stock with a value as of the grant date of $163,200.

27.     Prior to February 2006, James Halpin and Marc Weisman, independent directors at the time, told Morris Sutton that Jesse Sutton and Joseph Sutton had to be terminated because Majesco could not justify their salaries in light of their lack of credentials, the amount of salary paid, and Majesco's difficult financial situation.  Morris Sutton refused to terminate Jesse Sutton and Joseph Sutton and said that if the Board did terminate Jesse Sutton and Joseph Sutton, the three Suttons would set up a competitive company to take business from Majesco.  Because of Morris Sutton's refusal to terminate Jesse Sutton and Joseph Sutton, Halpin and Weisman resigned as directors as of February 3, 2006.  In order to be able to continue representing that a majority of directors were independent, however, Jesse Sutton and Joseph Sutton resigned on February 6, 2006, leaving the Company with three directors – defendants Morris Sutton, Aronson and Lipschitz.

28.     According to the Form 8-K filed with the SEC on February 9, 2006, Messrs. Halpin and Weisman resigned "because they believed Morris Sutton would not commit to continuing his association with the Company if the independent directors were to insist upon the resignation of certain other members to the Sutton family employed by the Company."

29.     Majesco lost another $2.587 million in the first quarter of fiscal 2006,

leaving the Company with only $300,000 in stockholders' equity, approximately one year after raising $50 million. In the first quarter, Majesco continued to write off the previous improperly capitalized software development costs. Thus, in the quarter ended January 31, 2006, Majesco reported that capitalized software development costs and prepaid license fees decreased by $11.7 million ($2.4 million of which was recorded as a separate loss on impairment of software development costs). Capitalized software development costs and prepaid fees therefore decreased from a balance of $17.3 million as of October 31, 2005 to a balance of $5.6 million as of January 31, 2006.

30.     From January through August 2006, Trinad made at least four separate overtures to provide liquidity to the Company in exchange for additional shares, all of which were rejected. For example, in January 2006, Trinad offered to invest $7.5 million in the Company through the purchase from the Company of approximately 4,385,714 shares of the Company's common stock at a price of $1.75 per share, which represented a premium of more than 20% over the closing price of the common stock on the date immediately preceding that offer. The Suttons failed to even respond to that offer, and did so solely in their own self-interest and to perpetuate their positions on Majesco's Board of Directors at the expense of providing needed liquidity to Majesco.

31.     On March 16, 2006, the Nasdaq Stock Market ("Nasdaq") notified Majesco that based on Majesco's Form 10-Q for the period ended January 31, 2006, Majesco no longer satisfied the requirement for continued listing on the Nasdaq Capital Market as set forth in Marketplace Rule 4310(c)(2)(B), which requires an issuer to have a minimum of either $2.5 million in stockholders' equity, $35 million market value of listed securities, or $500,000 of net income from continuing operations. Nasdaq gave Majesco until March 30, 2006 to prove it could meet

Nasdaq's listing requirements or be de-listed.

32.     Nonetheless, on or about March 24, 2006, Trinad offered to invest $3 million through the purchase from Majesco of 2,000,000 shares of common stock at a price of $1.50 a share, representing a premium of 27.1% over the then closing price of the common stock. Trinad specifically stated that its offer was made to ameliorate Majesco's liquidity problems and to avoid delisting by the Nasdaq exchange. Majesco rejected Trinad's offer in order that Morris Sutton, Joseph Sutton and Jesse Sutton retain control of Majesco and continue to receive their wasteful compensation packages.

33.     In April and May 2006, Morris Sutton, Aronson and Lipschitz appointed four new board members to serve on Majesco's board of directors – Keith Harrison, Marc Mazur, Stephen Wilson and Steven Weinstein. On July 21, 2006, Steven Weinstein resigned after serving little more than two months on Majesco's board. The only explanation provided in the relevant SEC disclosure was "a change in his employment that presented conflicts with his ability to serve on the Board of Directors." On October 9, 2006, Keith Harrison resigned without explanation. These director resignations were in addition to the February 2006 resignations of Halpin and Weisman, described above.

34.     On or about June 27, 2006, Trinad made another offer to invest $3.0 million in the Company through the purchase of 2.0 million shares of common stock at a price of $1.50 per share, an amount that still represented a premium of $.07, or nearly 5% over the closing price of the stock on the date prior to the offer. On July 19, 2006, Trinad sent yet another letter to Majesco's board in which it again renewed its offer to invest $3.0 million in the Company through the purchase of 2.0 million shares of common stock at a price of $1.50 per share. On August 9,

2006, Trinad reiterated its offer to make an equity investment of $3.0 million. These offers were rejected by the board. Again, the Suttons refused Trinad's offers solely in their own self-interest and to perpetuate their positions on Majesco's Board of Directors, at the expense of providing liquidity necessary to stabilize Majesco's finances and regain its NASDAQ listing

35.    On or around August 7, 2006, each of Messrs. Morris Sutton, Jesse Sutton, Joseph Sutton, Laurence Aronson, Louis Lipschitz, Marc Mazur, Stephen R. Wilson, filed Form 4 Statements of Changes in Beneficial Ownership – disclosing the acquisition of additional shares and/or options issued by the Company. According to the Form 4's, shares were acquired by Morris Sutton (195,582), Jesse Sutton (170,213) and Joseph Sutton (99,291), "representing restricted stock that vests as follows: one-half of the shares vest on the second anniversary of the grant date and the remaining half of the shares vests on the third anniversary of the grant date." This appears to be all that was disclosed as it relates to the acquisition of these shares by these executives. Shares and options to purchase shares were acquired by Aronson (7,092 shares/19,608 options), Lipschitz (7,092 shares/19608 options), Harrison (4,728 shares/13,072 options), Mazur (4,728 shares/13,072 options) and Wilson (5,910 shares/16,340 options). John Gross, Majesco's chief financial officer, acquired 113,475 shares. These grants were part of a scheme by defendants to dilute Trinad's investment in the Company in order to further entrench defendants in their corporate positions.

36.    On August 29, 2006, within days of Majesco's filing of its form 10-Q for the quarter ended July 31, 2006, the Company announced a flip-flop of positions between Jesse Sutton and Morris Sutton, whereby Morris resigned as interim CEO and director, and Jesse was appointed to replace him as interim CEO and director. Morris resumed his title as Chairman Emeritus.

37.     Two days later, on September 1, 2006, Majesco filed an amendment to its Form 10-Q for the quarter ended April 30, 2006, including a discussion of controls and procedures not previously contained in the original 10-Q filed in May, which disclosed that the Company's internal controls were inadequate.

38.     On September 12, 2006, the Company filed its 10-Q for the quarter ended July 31, 2006.  The Company reported a net loss of ($2.471) million for the nine months then ended. The financial statements disclosed that the Company had "Cash and cash equivalents," "Other receivables" and "Income tax receivable" totaling approximately $5.0 million, and accounts payable and accrued expenses of $10.5 million.

39.     In the 10-Q, the Company disclosed that on August 3, 2006, the Company issued an aggregate of 1,156,028 shares of restricted stock to certain key executives and employees under the 2004 Employee, Director and Consultant Incentive Plan.  One half of the shares vest on the second anniversary of the grant date, and the remaining half vest on the third anniversary of the grant date.

40.     The Company also disclosed that in July 2006, it "finalized and adopted an employee incentive plan that provides for cash payments aggregating 0.8 million to $2.2 million if we achieve certain adjusted net income targets for the year ending October 31, 2006."  The Company disclosed that it had already accrued $.4 million under the plan as of July 31, 2006.

41.     Trinad is the largest beneficial owner of shares in Majesco other than the amounts owned by the Suttons.  As of the latest filings, Trinad owns 2,909,076 shares of common stock, while the Suttons are the beneficial owners of 5,278,639 shares (Jesse Sutton owns 2,232,888 shares, Joseph Sutton owns 2,232,888 shares, and Morris Sutton owns 812,863 shares).

42. The foregoing issuance of shares to the Suttons and other insiders was made to frustrate any effort by Trinad to acquire a controlling interest in Majesco. Upon information and belief, the award of shares was not made pursuant to any investigation of compensation arrangements. In fact, the key motivating factor was Trinad's additional acquisition of shares. Majesco lost $72 million for fiscal year ended October 31, 2005. In fiscal 2006, it continued to suffer losses. To reward its executives, including members of the Sutton family, was reckless and in breach of fiduciary duty.

43. Evident of the true motives of defendants Sutton, Lipschitz and Aronson is a recently misdirected e-mail – mistakenly sent to a representative of Trinad. In response a May 25, 2006 e-mail from Trinad to Majesco, Morris Sutton wrote to defendants Lipschitz and Aronson (and by mistake to Wolf as well), as follows: "I guess he finally realizes that he will never get control!!! So much for a proxy!!"

44. The Suttons, Lipschitz and Aronson have conspired and agreed to take whatever action is necessary to retain control of Majesco in dereliction of their fiduciary duties of loyalty and due care to Majesco and its shareholders, including plaintiff. Lipschitz and Aronson have assisted Morris Sutton in his effort to maintain control of Majesco to the detriment of Majesco's shareholders, by wrongfully refusing to consider the offers by Trinad, approving the improper compensation arrangement described above, and failing to fulfill responsibilities as members of Majesco's audit committee. Among other things, had Lipschitz and Aronson acted properly and fulfilled their audit committee responsibilities, many of the accounting manipulations orchestrated by the Suttons could not have been committed. The newly appointed directors who remain on the board – Messrs. Wilson and Mazur – were selected and appointed by Morris Sutton,

13

Aronson and Lipschitz and are beholden to their interests.

45.     As of the date hereof, Majesco continues to suffer under the leadership of defendants and continues to experience a liquidity crisis.  As set forth above, in its audit financial statements for fiscal year ended October 31, 2005, the Company's auditors reported that there was substantial doubt about the Company's ability to continue as a going concern.

46.     In addition, in fiscal years 2003, 2004 and 2005, Morris Sutton arranged for Majesco to utilize a printing and packaging company, which is co-owned by Morris Sutton's brother. The Company was charged $1.9 million, $4.1 million, and $2.3 million in each year.  As of October 31, 2005 all but $187,000 was paid.

47.     As set forth in its correspondence with the Company, the capital Trinad was offering to invest in the Company was desperately needed by Majesco to ensure that the Company continued to meet the financial guidelines necessary to comply with Nasdaq's listing requirements.

48.     Moreover, in July, the Russell U.S. Indexes – an investment services firm that produces investment guidance widely followed by institutional investors – announced that the Company would be removed from the Russell 3000 membership list, further damaging the Company's ability to raise capital.

**The False and Misleading Statements**

49.     As alleged in the Class Action and in the Securities Action, the Suttons' recent misconduct is nothing new.  Rather, it is part of a continuing pattern of misconduct intended to entrench the Suttons in their control of Majesco and perpetuate their improper exploitation of that control for their financial gain and at the expense of the Company and its other shareholders.  Thus,

as alleged in the Class Action, Majesco overstated revenues for the year ending October 31, 2004 and understated costs of sales such that it overstated its operating income by 469%: Majesco reported operating income of $12,112,000 while actual operating income was only $2,128,000. Majesco recorded as revenue in September 2004 orders not completed until after October 2004, understated its reserve for allowances to its customers, capitalized software costs that should have been expensed, and mis-recorded the costs of sales of video games to major customers. (See Class Action complaint, ¶¶ 49-62, and 122-144.)

50.     The net result of Majesco's accounting procedures was that the Suttons were able to manipulate Majesco's revenues and earnings in order to deceive investors. The Suttons, who were large Majesco shareholders, knew that they were deceiving the public and the marketplace but were under great pressure to continue the illusion that the Company was thriving.

51.     Defendants Aronson and Lipschitz, as members of the Audit Committee, were reckless in their failure to adopt internal controls and procedures that would have prevented such misconduct. Motivated by their allegiance to the Suttons, Aronson and Lipschitz neglected their fiduciary duty to Majesco's shareholders.

52.     As a result of these actions, the defendants have subjected Majesco to potential damages in the millions of dollars for the Class Action and the Securities Action. Their conduct constitutes corporate waste and a breach of the duties of loyalty and due care within the meaning of Delaware law.

53.     As alleged in the Class Action Complaint, during fiscal 2005, the Suttons misrepresented material facts to the investing public, to further the Company's efforts to raise money in the public offering in January 2005, and to delay the public's discovery of the falsity of the

15

Suttons' misrepresentations.

54.    For example, as alleged in the Class Action Complaint, on December 8, 2004, the Company issued a press release ("December 8th Press Release") announcing its financial results for the fiscal year ended October 31, 2004, including a consolidated statement of operations, and its outlook for fiscal year ending October 31, 2005.  The December 8th Press Release was materially false and misleading in its overstatement of revenue and operating income because Majesco understated its reserve for allowances to its customers, recorded as revenue in September 2004 orders not completed until after October 2004, capitalized software costs that should have been expensed, and mis-recorded the costs of sales of video games to major customers.

55.    As more fully described in the Class Action and Securities Action, the Suttons were aware that the statements made were materially false when made because they knew:

a.    Majesco lacked an adequate internal accounting and control system to ascertain technological feasibility for games which were to be released in more than 12 months in the future as well as the ability to reasonably forecast product revenues and marketing costs;

b.    Majesco was not likely to forecast reasonably a gross profit on games in development as it had a limited history of developing frontline games;

c.    Majesco was committed in the next 12 months to $23 million of additional development costs on these games which made the probability of realizing a profit large enough to recover the total cost of developing these games highly speculative at best; and

d.    Subparagraphs a - c above precluded Majesco from capitalizing the development costs of these games pursuant to GAAP.  Indeed, in its quarterly report filed with the SEC for the period-ended July 31, 2005, Majesco acknowledged the impropriety of capitalizing the development costs by writing off $6.115 million of previously capitalized software development costs as impaired because the games were not "commercially feasible."

56.    The December 8th Press Release also stated that the "Company expects

16

$175-$185 million in net revenues and operating income of $16-$18 million. This guidance anticipates increases in net revenue for all business units and anticipated improvement in profitability from video games, while including consideration for planned increased investment in both product development and marketing…" and "…Advent Rising, the first title in a planned trilogy of games that has been developed in collaboration with award-winning science fiction author Orson Scott Card: scheduled to launch in the spring of 2005 for Xbox and PC…"

57.     This statement ("2005 Outlook") was materially false and misleading, and, during the fiscal year ending October 31, 2004, the Suttons knew from weekly sell through reports that Majesco made shipments to retailers in excess of end-user demand and that retailers would either return a material quantity of the unsold product or would buy less 2005 product and sell the older product.

58.     The misrepresentations set forth above were incorporated and reaffirmed in the Registration Statement filed with respect to the public offering in January 2005.  The Registration Statement also reiterated the Company's projections first released in December that the Company "expects $175 - $185 million in net revenues and operating income of $16 - $18 million. This guidance anticipates increases in net revenue for all business units and anticipated improvement in the profitability from video games," and that the Company expected "to expand our frontline titles by releasing several new titles in 2005, including, *Advent Rising*, which is anticipated to be the first in a trilogy of epic science fiction games developed in collaboration with Orson Scott Card… By summer 2005, we intend to release… *Advent Rising*…" ("Advent Rising Statement")

59.     As set forth above, Majesco had no reasonable basis for its sales projections and instead was aware of the difficulties it was experiencing with Advent Rising and in

general with the production of "frontline" or "premium" titles.  Thus, from and after December

2004, the Suttons knew that the production and development of *Advent Rising* was experiencing

material technical problems with the following features of the game:  1) slowness in load time; 2)

rough or unplayable "cut scenes;" 3) animation "freezing;" 4) clipping problems; and 5) distortions

in the audio such that the dialogue was inaudible or was drowned out by the musical score. ("Advent

Rising Problems")  In reality, the Suttons also knew that Majesco was experiencing weak sales all

across the Company's product lines.

        60.     Despite these concerns, throughout the first six months of fiscal 2005, the

Suttons continued to capitalize software costs associated with the development of Advent Rising and

other frontline titles without a reasonable basis for concluding that these costs would be recouped at

a later date.  Rather, given the difficulties then being experienced by the Company, there was no

reasonable basis for capitalizing these costs.

        61.     On March 9, 2005, Majesco issued a press release ("March 9th Press

Release") reporting its results for the quarter ending January 31, 2005.  Jesse Sutton participated in a

conference call ("March 9th Conference Call") to discuss Majesco's results for the quarter ending

January 31, 2005.

        62.     The financial performance reported in the March 9th Press Release and/or

the March 9th Conference Call was false and misleading.  Among other things, revenues for the

period were overstated because Majesco failed to adjust its price protection reserves to reflect an

increase in customer returns and weakening sales reports.  Moreover, costs of sales were

significantly understated because Majesco continued to capitalize all development costs for games

released but not shipped, such as Psychonauts.  As a result, the Press Release and the March 9th

Conference Call overstated gross profit because it failed to take into account the foregoing necessary adjustments.

63. Moreover, management had no reasonable basis for reiterating that it expected revenue of $175 - $185 million and operating income of $16 - $18 million with increase in net revenue from all product lines and improvement in profitability from video games. Majesco knew that it needed to make price protection adjustments during this period as a result of lagging sales, and it knew that it was experiencing difficulties in developing and releasing front line or premium titles. Also, the statements by Jesse Sutton that Advent Rising would be released in the third quarter – and was expected to be a top performer – were unreasonable in light of the foregoing.

64. On June 7, 2005, Majesco issued a press release ("June 7th Press Release") reporting its results for its second quarter ended April 30, 2005. Jesse Sutton participated in a conference call ("June 7th Conference Call") to discuss the same results. In the June 7th Press Release, Majesco reported, in part that:

> "Our gross margin increased to 42.4% for the quarter, underscoring the strength of our diversified product offerings. The increase expenses for the quarter were directly related to infrastructure growth to better position the Company for our future. We expect this level of expenditures to continue as we prepare to release key products in the coming quarters, implement new support functions and compliance and testing related to Sarbanes-Oxley."

> "We are entering the important second half of our fiscal year with confidence that we are well positioned to achieve our objectives for full year 2005. We remain focused on global growth, both organic and otherwise."

65. The June 7th Press Release disclosed that for the six months ended April 30, 2005, net revenues were $19.9 million, cost of sales was $11.441 million, gross profit was $7.53 million and operating income was $.821 million. These amounts were materially misstated because the Company's price protection and allowance was understated by several million dollars because of

the amount of product being returned, and because of the Company's failure to recognize any impairment in the inventory game value or materially reduce its capitalized software costs for games released, though not shipped, and as a result of the difficulty being experienced by the Company in developing and marketing frontline titles.

66.     The June 7th Press Release was also misleading because the defendants reported that Advent Rising had been shipped with great feedback and reorders, but at the same time failed to disclose any of the production difficulties the Company was experiencing as a result.

67.     Moreover, the June 7th Press Release reiterated Majesco's earlier guidance that it expected net revenues of $175 - $185 million, and operating income of $16 - $18 million. For the reasons stated above, the Suttons had no reasonable basis for this projection.

68.     Majesco filed on June 14, 2005 its quarterly report on Form 10-Q with the SEC for its second quarter ended April 30, 2005 ("June 14th 10-Q"). This Form 10-Q contained the same false information as set forth above in the June 7th Press Release.

### Derivative and Demand Futility Allegations

69.     Plaintiff brings this action derivatively in the right and for the benefit of Majesco to redress injuries suffered, and to be suffered, by Majesco as a direct result of the breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

70.     Plaintiff will adequately and fairly represent the interests of Majesco in enforcing and prosecuting its rights. Plaintiff is and was an owner of Majesco common stock during all times relevant to defendants' wrongful course of conduct alleged herein and remains a Majesco

shareholder.

71.     At the time this action was initiated, the Majesco Board consisted of five individuals, three of whom have been with Majesco since the time the acts complained of occurred and who are defendants herein – Morris Sutton, Laurence Aronson, Louis Lipschitz – and two recently appointed members of the board, selected by the foregoing defendants.  Plaintiff did not make a pre-suit demand to institute this action because such a demand would be a futile, wasteful and useless act, as these directors are not disinterested and independent, as described herein.

72.     In particular, Morris Sutton is personally charged with wrongfully refusing to terminate Jesse Sutton and Joseph Sutton, his sons, and with failing to disclose his own compensation.  Mr. Sutton is also charged with knowledge of and dissemination of the false financial information that has led to the Class Action.  Morris Sutton will not institute an action against himself for the wrongful conduct described herein.  Thus, demand on Morris Sutton is futile.

73.     Demand upon Laurence Aronson and Louis Lipschitz would also be futile because these directors are personally charged with participating in or allowing the wrongful conduct described above – in particular, as members of the Audit Committee – in failing to institute procedures to insure that Majesco accurately reported its financial condition to the investing public.  Demand on Aaronson and Lipschitz would also be futile because Lipschitz and Aaronson have pre-judged the merits of these complaints.  In particular, as set forth above, Trinad has regularly repeated its demands that Majesco terminate Jesse Sutton and Joseph Sutton because their compensation was and is unwarranted and constitutes corporate waste.  Plaintiff also urged that Majesco adopt corporate governance procedures to remedy the financial misreporting that resulted in the Class Action.

74.     On April 18, 2006, Laurence Aaronson and Louis Lipschitz responded to Trinad's March 30, 2006 letter denying that (a) any compensation paid to Jesse Sutton and Joseph Sutton was unwarranted or constituted corporate waste and (b) Trinad's characterizations of Majesco's financials were inaccurate.  Since Messrs. Aronson and Lipschitz have already rejected the claim of unwarranted compensation for Jesse Sutton and Joseph Sutton and misleading financial statements, any demand upon them to bring a suit on the claims that they have already rejected is futile.   In addition, the newly appointed directors who remain on the board – Messrs. Wilson and Mazur – were selected and appointed by Morris Sutton, Aronson and Lipschitz and are beholden to their interests.

75.     Furthermore, as plaintiff demonstrated throughout this complaint, the conduct of defendants challenged herein was not the product of a valid exercise of business judgment, but was motivated by the defendants' self-interest in perpetuating their control over Majesco.

76.     Defendants Sutton, Lipschitz and Aronson have conspired and agreed to take whatever action is necessary to retain control of Majesco in dereliction of their fiduciary duties of loyalty and due care to Majesco and its shareholders, including plaintiff.

## COUNT I

**On Behalf of Majesco Against the Suttons, Lipschitz, and Aronson For Breach of Fiduciary Duty - Entrenchment**

77.     Plaintiff repeats and realleges the allegations of paragraphs 1 through 76 hereof as if fully set forth herein.

78.     As noted in detail above, the Suttons, Lipschitz, and Aronson have engaged in an improper, active, and conscious scheme to entrench themselves in their officer and

22

director positions.

79.     These defendants have engaged in this scheme of entrenchment for wholly selfish reasons, to the detriment of Majesco and its shareholders.

80.     The conduct of these defendants constitutes a serious and continuous breach of their fiduciary duties to employ good faith, due care, and loyalty in the performance of their duties.  As a result of these breaches, Majesco was foreclosed from employing directors and officers who would have put the interest of the Company first, including approving necessary and appropriate investments in the Company, and ensuring proper accounting and reporting.

81.     As a proximate result of these improper entrenchment efforts, the resultant accounting and reporting errors described above, and the Company's pattern of misstatements in public filings, have led to a complete loss of credibility by the Company, a spiral of financial decline, and a class action lawsuit.

82.     Also as a proximate result of these improper entrenchment efforts, Majesco was foreclosed from approving investments in the Company that could have saved it from financial distress.

83.     Plaintiff is entitled to damages on behalf of Majesco for the loss in market value of the Company, and the expenses and other losses incurred, in an amount to be determined at trial.

## COUNT II

### On Behalf of Majesco
### Against the Suttons For Breach of Fiduciary Duty – Misstatements and Omissions

84.     Plaintiff repeats and realleges the allegations of paragraphs 1 through 83 hereof as if fully set forth herein.

23

85.　　As noted in detail above, from December 2004 through September 2005, the Suttons engaged in a campaign of misleading Majesco's employees, shareholders, investors, debt holders and the investment community in general as to the Company's financial situation by making statements in SEC filings and press releases that were false and misleading.

86.　　With respect to the various misstatements and omissions detailed in paragraphs 49 through 68, plaintiff relies upon the group pleading doctrine that creates the "presumption that statements in prospectuses, registration statements, annual reports, press releases, or other group-published information are the collective work of those individuals with direct involvement in the everyday business of the company." *In re Oxford Health Plans, Inc*., 187 F.R.D. 133, 142 (S.D.N.Y. 1999). Thus, all of the misstatements and omissions made by Majesco are attributable from December 2004 through September 2005 to Morris Sutton, who was Chairman Emeritus of the Company, Jesse Sutton who was President and director of the Company, and Joseph Sutton, who was executive vice-president and director of the Company.

87.　　The Suttons' conduct represents a serious and continuous breach of their fiduciary duties to employ good faith and loyalty in the performance of their duties. The Company's pattern of misstatements in public filings led to a complete loss of credibility of the Company and led to a spiral of financial decline. Majesco is a defendant in a securities class action as a result of the defendants' misconduct in which the plaintiffs in that action seek damages in excess of $100 million. Majesco has already incurred substantial legal and other costs on account of having to mount a defense to the class action, all on account of defendants' misconduct.

88.　　Plaintiff is entitled to damages on behalf of Majesco in an amount to be determined at trial.

## COUNT III

### On Behalf of Majesco Against the Suttons, Lipschitz, and Aronson For Corporate Waste

89.     Plaintiff repeats and realleges the allegations of paragraphs 1 through 88 hereof as if fully set forth herein.

90.     The Suttons, Lipschitz, and Aronson are liable for waste arising from the unplanned and unsupervised dissipation of the $50 million raised in the public offering, the unnecessary salaries for Jesse Sutton and Joseph Sutton; the payments to Morris Sutton's brother for packaging expenses; and the expenses from the Class Action because of defendants knowing misstatements.

91.     The Suttons, Lipschitz, and Aronson effected these wasteful transactions on terms that no person of ordinary, sound business judgment could conclude represent a fair exchange.

92.     The Suttons, Lipschitz, and Aronson had no valid business purpose in disposing of the Company assets as described herein.

93.     Plaintiff is entitled to damages on behalf of Majesco for the losses caused by the waste in an amount to be determined at trial.

### COUNT IV

### On Behalf of Majesco Against the Suttons, Lipschitz, and Aronson For Oppression of Minority Shareholders

94.     Plaintiff repeats and realleges the allegations of paragraphs 1 through 93 hereof as if fully set forth herein.

95.     Majesco's minority shareholders, having entrusted their money to the

Majesco enterprise, have a reasonable expectation that they will be treated fairly by Majesco's majority shareholders.

96.     Morris Sutton, Jesse Sutton, Joseph Sutton and their family or nominees control more than thirty percent of the common stock of Majesco, which has given them effective control of the corporation. As such, they have a fiduciary duty to protect the interests and reasonable expectations of the minority shareholders, and have a fiduciary duty to critically assess fairly all third party transactions proposed by Trinad.

97.     The Suttons, Lipschitz, and Aronson breached this duty in order to maximize their control of the Board and rejected Trinad's proposal in derogation of the rights of the minority shareholders who would have benefited from Trinad's proposal.

98.     As a result of the foregoing, Majesco has been damaged by an amount to be determined at trial.

WHEREFORE, plaintiff respectfully requests that the Court enter judgment as follows:

1. On Count I, damages in an amount to be determined at trial.

2. On Count II, damages in an amount to be determined at trial.

3. On Count III, damages in an amount to be determined at trial.

4. On Count IV, damages in an amount to be determined at trial.

5. Awarding interest on the foregoing amounts as allowed by law;

6. Awarding attorneys' fees and the costs and disbursements of this action; and

7. Granting such other and further relief as the court may deem just and proper.

## JURY DEMAND

Plaintiff demands a jury trial on all issues for which plaintiff is entitled to a jury trial.


Dated: New York, NY
November 2, 2006

BRAGAR WEXLER & EAGEL, PC


By: /s/ Ronald D. Coleman
Ronald D. Coleman, Esq. (RC 3875)
Lawrence P. Eagel, Esq.
Raymond A. Bragar, Esq.

One Gateway Center, Suite 2600
Newark, NJ 07102
(973) 471-4010
(973) 471-4646 (facsimile)

Jeffrey H. Squire, Esq.
KIRBY MCINERNEY & SQUIRE, LLP
830 Third Avenue
New York, NY 10022
(212) 371-6600
(212) 486-0462 (facsimile)

Attorneys for Plaintiff